**Heather and Amanda BLACK, minors by their parents and natural guardians, Leonard and Wilma BLACK and Leonard and Wilma Black, in their own right; Erin Davis, a minor, by her parent and natural guardian, Gregory Davis and Gregory Davis in his own right; Stefanie and Darcie Hulings, minors, by their parents and natural guardians, Dennis and Luene Hulings and Dennis and Luene Hulings, in their own right; and Elizabeth Jones, a minor, by her parent and natural guardian, Nancy R. Jones and Nancy R. Jones, in her own right, Appellants,**

v.

**INDIANA AREA SCHOOL DISTRICT; David Laird, Superintendent of the Indiana Area School District; Clark Lemuel Myers, Jr.; Vernon Claypoole; Vernon R. Claypoole, Inc.**

No. 91–3481.

United States Court of Appeals, Third Circuit.

Argued Jan. 22, 1992.

Decided Jan. 29, 1993.

Maureen Dunn Harvey (argued), Wallace, Chapas & Jamiolkowski, Pittsburgh, PA, for appellants.

Louis Anstandig (argued), Eileen Anstandig, Anstandig, Levicoff & McDyer, Pittsburgh, PA, for appellees Indiana Area School Dist. and David Laird, Superintendent.

George P. Faines (argued), Dan M. Brookhart, Thorp, Reed & Armstrong, Pittsburgh, PA, for appellee Clark Lemuel Myers, Jr.

Richard C. Levine (argued), Rosenberg, Kirshner P.A., Pittsburgh, PA, for appellees Vernon Claypoole and Vernon R. Claypoole, Inc.

Before: STAPLETON, SCIRICA, and ALITO, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Plaintiff schoolchildren allege that they were sexually molested by their school bus driver while being driven in the bus to and from school and, together with their parents and guardians, brought a civil rights action under 42 U.S.C. § 1983 against the bus driver, Clark Myers, the school superintendent, David Laird, the school district, the bus company, Vernon R. Claypoole, Inc., and its president, Vernon Claypoole. The district court granted a motion for

summary judgment as to all defendants, and plaintiffs appeal. We will affirm.

### I.

Plaintiffs allege that at various times between September 1984 and December 1988, Myers sexually molested the girls while on the school bus. At the time of the alleged molestations the schoolchildren were six, seven, and eight years old.

There were only two complaints made about Myers' alleged activities. One was in February of 1985 and the other was in December of 1988. In February of 1985, Dennis Hulings contacted the school district with concerns that Myers might have sexually molested Hulings' daughter, Stefanie. Superintendent Laird immediately contacted the Hulings to verify the complaint. The Hulings were unsure that any molestation had occurred and were reluctant to press criminal charges. Laird called a meeting which Mr. and Mrs. Hulings, Myers, and Laird attended. At the conclusion of the meeting Laird and the Hulings were convinced that, while Myers may have shown some special affection for Stefanie, no sexual abuse had taken place. Laird instructed Myers to stop showing special attention to any particular child, and the Hulings apologized to Myers for having brought the complaint. Laird did not report the Hulings' complaint to Children and Youth Services because he, like the Hulings, did not believe that Stefanie had been abused. There were no further complaints against Myers until December of 1988.

In December of 1988, another parent informed Laird that Myers had molested her daughter and other children, and that she intended to press criminal charges. Laird insisted that Myers be suspended from driving a bus for the school district, and Myers has not driven for the school district since that time. Children and Youth Services was notified of the complaint and a criminal prosecution ensued.

### II.

Plaintiffs allege that the children's constitutionally protected right to bodily integrity [1] was violated by Myers' alleged abuse. They assert that Myers was acting under color of law when he committed the assault, and that he is thus personally liable under § 1983. With respect to Laird, plaintiffs claim that Laird established and maintained, with deliberate indifference to the consequences, a policy, practice or custom that directly caused the harm, and so is independently liable for the wrong. Additionally, plaintiffs claim that Laird had an affirmative duty to protect the children under his care, arising from a "special relationship" between the school district and the children. Likewise, plaintiffs claim that the school district is liable both on a "policy leading to injury" theory and a "special relationship" theory. Finally, plaintiffs claim that Vernon Claypoole and the Claypoole Corporation are independently liable for plaintiffs' injuries because, while acting under color of state law, they failed to sufficiently monitor Myers.

■ This Court's standard for reviewing a summary judgment is plenary. Regarding the facts in the light most favorable to the non-moving plaintiffs, we must determine whether the moving defendants are entitled to judgment as a matter of law. *See Sames v. Gable,* 732 F.2d 49 (3d Cir. 1984); *Betz Laboratories, Inc. v. Hines,* 647 F.2d 402 (3d Cir.1981).

### III.

■ With respect to Myers, Claypoole and Vernon R. Claypoole, Inc., the threshold question is whether they were acting under color of state law. If they were not, they can have no liability under 42 U.S.C. § 1983. *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982).

Vernon R. Claypoole, Inc. is a private entity that was under contract with the school district to provide transportation for

---

**1.** Plaintiffs have a liberty interest in their bodily integrity that is protected by the Fourteenth Amendment. *Ingraham v. Wright,* 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977); *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982).

students to and from school. Myers and Claypoole were, respectively, an employee and an officer of this state contractor. Thus, none of these three defendants was an officer or employee of the state. We must nevertheless determine whether their actions are "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982). Based on *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), we conclude that they cannot.

In *Rendell–Baker*, five employees of a private school brought a § 1983 suit against a Massachusetts private school, the New Perspectives School, and its director, alleging that they had been discharged for speech protected by the First Amendment. The crucial issue was whether the director and the school were acting under color of state law when the plaintiffs were discharged.

New Perspectives specialized in dealing with students who had had difficulty completing public high school because of behavioral problems or other special needs. Nearly all of the students in the school were referred to it by public school committees or state agencies. Public funds accounted for at least 90% of the school's operating budget. Under Massachusetts law, all students with special needs were entitled to a suitable public education under the supervision of the state and local governments. Public school committees had a statutory obligation to identify all children who had special educational needs and to prepare an individualized education program for each of them. The state statute provided that public school committees could contract with private schools to implement these educational programs. Public school committees and a state agency had entered into contracts with New Perspectives under which New Perspectives accepted the referred individuals as students and the public entities paid tuition in return.

The Supreme Court held in *Rendell–Baker* that New Perspectives and its superintendent did not act under color of state law

when discharging the plaintiffs. The Court held:

> The school ... is not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts. 457 U.S. at 830, 102 S.Ct. at 2764.

■ It is clear from *Rendell–Baker* that a state contractor and its employees are not state actors simply because they are carrying out a state sponsored program and the contractor is being compensated therefor by the state. Nor does the fact that the activity being performed is a public function render the contractor and its employees state actors. For the nature of the contractor's activity to make a difference, the function performed must have been "traditionally the *exclusive* prerogative of the State." 457 U.S. at 842, 102 S.Ct. at 2772 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 455, 42 L.Ed.2d 477 (1974)). The nature of the contractor's activity in *Rendell–Baker* did not make the contractor and its employees state actors because the policy choice of Massachusetts to provide educational services for maladjusted high school students at public expense "in no way [made] these services the exclusive province of the State." *Id.* 457 U.S. at 842, 102 S.Ct. at 2772.

The Court in *Rendell–Baker* acknowledged that schools in Massachusetts, and the New Perspectives School in particular, were heavily regulated. This fact made no difference, however, because the discharge decisions complained of "were not compelled or even influenced by any state regulation." *Id.* at 841, 102 S.Ct. at 2771.

■ We conclude that the positions of Vernon O. Claypoole, Inc. and its employees in this case are indistinguishable from the positions of New Perspectives and its employees in *Rendell–Baker*. While Vernon O. Claypoole, Inc. and its employees were carrying out a state program at state

expense, they were not performing a function that has been "traditionally the exclusive prerogative of the state" and there was no state regulation that "compelled or even influenced" the conduct which is alleged to have violated plaintiffs' constitutional rights.

*Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) and *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), the plaintiffs' principal authorities, are distinguishable from *Rendell–Baker* in ways that dictate a finding of no state action in this case. In *Burton,* the state, in its capacity as a landlord of publicly owned space, was found to be in a "symbiotic relationship" with its private tenant which maintained an open policy of refusing to serve African Americans in its restaurant. As we recently explained in *Boyle v. Governor's VOAC,* 925 F.2d 71, 76 (3d Cir.1991), *Burton* turned on the fact that "the state had many obligations and responsibilities regarding the operation of the restaurant; mutual benefits were conferred; and the restaurant operated physically and financially 'as an integral part of a public building devoted to a public parking service.'" (quoting *Burton* ). Indeed, in the words of the *Burton* court, the "profits earned by [the restaurant's] discrimination not only contribute[d] to, but also [were] indispensable elements in, the financial success of a governmental agency." 365 U.S. at 724, 81 S.Ct. at 861.

In this case, as in *Rendell–Baker,* there was no symbiotic relationship between the state and its independent contractor. Here, as in *Rendell–Baker,* the cooperation between the two was only that appropriate to the execution of the subject matter of the contract and the contractor's "fiscal relationship with the State is not different from that of many contractors performing services for the government." 457 U.S. at 843, 102 S.Ct. at 2772.

In *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), the Court found that a physician, employed by the State to provide medical care to inmates in state prison, was a state actor for the purposes of § 1983 liability. Because the State, through incarceration, had deprived the inmates of access to medical care, it had a non-delegable constitutional duty to provide medical care of its own. It was only the State that could provide medical care to inmates and the physician with whom the State had contracted to provide such care, thus "function[ed] within the State system." *West* at 55, 108 S.Ct. at 2259. This finding echoed the formulation of the Court in *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 352, 95 S.Ct. at 454, that state action is "present in the exercise by a private entity of powers traditionally exclusively reserved to the State." As we have noted, here, as in *Rendell–Baker,* the state contractor was not providing a service within the exclusive province of the state.

We thus conclude that the actions of Myers, Claypoole, and Vernon O. Claypoole, Inc. cannot fairly be attributed to the state and that summary judgment in their favor was required.

### IV.

Superintendent Laird is concededly a state actor. Accordingly, we pass to a consideration of whether he is legally responsible, under § 1983, for the alleged harm done to the plaintiffs. We conclude that there is no genuine issue of fact regarding Laird's liability and that he is entitled to summary judgment as a matter of law.

Plaintiffs advance two theories of liability with respect to Laird. First, plaintiffs contend that Laird, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm," and so is liable under this Court's holding in *Stoneking v. Bradford Area School District,* 882 F.2d 720, 725 (3d Cir. 1989) cert. den. 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). See also *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Second, plaintiffs contend that Laird had a special relationship with the children that imposed an affirmative duty on him to protect the

children from harm. We are unable to accept either contention.

In *Stoneking,* the principal and assistant principal of a high school were alleged to have followed a practice of "reckless indifference to instances of known or suspected sexual abuse of students by teachers." 882 F.2d at 724–25. By concealing complaints of such abuse, discouraging such complaints, failing to investigate such complaints, and requiring complainants to apologize to the accused teachers, these school officials allegedly "created a climate which, at a minimum, facilitated sexual abuse of students by teachers." 882 F.2d at 725. Based on these allegations, we concluded that there was a material dispute of fact precluding summary judgment in favor of the school officials. We held that they could be found liable if they acted with deliberate indifference as to whether students were sexually abused and if the manner in which they handled complaints affirmatively contributed to the plaintiff's being assaulted.

■ After examining the 1985 and 1988 incidents involving reports about Myers, as well as a 1982 complaint that did not involve Myers, the district court concluded that, given Laird's response to the incidents, a finder of fact could not award judgment to the plaintiffs on a *Stoneking* theory. We agree.

In 1982, Laird responded promptly to charges that an assistant principal had sexually abused a male junior high school student. The person who reported the incident to Laird advised him that the matter was being reported to Children and Youth Services. Laird immediately transferred the assistant principal, pending investigation, to a job where he would have no contact with students. Laird later accepted the assistant principal's resignation as part of a resolution of the matter involving a criminal prosecution. When asked for references for the assistant principal, Laird truthfully responded that he had accepted the assistant principal's resignation after allegations of misconduct. Nothing in Laird's handling of this incident suggests the sort of policy of condonation of sexual abuse that would qualify Laird for *Stoneking* liability.

Upon hearing of the Hulings' concerns in 1985, Laird immediately contacted them to determine the basis for their concerns. Even though the Hulings had doubts about whether she had been molested and even though there had been no previous complaints about Myers, Laird instituted an investigation. Myers, in the presence of the parents, was confronted with their concerns and called upon to respond. Based on what had been learned from Stephanie and Myers' explanation, both Laird and the Hulings became convinced that there had been no assault. As a result of their belief that there had been no wrongdoing, neither Laird nor the Hulings notified Children and Youth Services.

The plaintiffs fault Laird for failing to conduct a more thorough examination and for failing to notify Children and Youth Services.[2] They contend that a more thorough investigation by Laird or by Children and Youth Services would have identified Myers as a molester and thereby have prevented any further harm. Under *Stoneking,* however, a plaintiff must do more than show the defendant could have averted her injury and failed to do so. In order to establish liability a plaintiff must demonstrate both that the defendant's policy, practice, or custom played an affirmative role in bringing about the sexual abuse and that the defendant acted with deliberate indifference to that abuse. In order to establish deliberate indifference on the part of the defendant, "something more culpable [must be shown] than a negligent failure to recognize [a] high risk of harm" to

2. Plaintiffs insist that Laird had a duty under the Child Protective Services Law, Act 124 of 1985, 11 P.S. § 2201 et seq. (repealed Dec. 19, 1990, effective in 90 days; subject matter now contained in 23 Pa.C.S.A. § 6301 et seq.) to report the 1985 incident to Children and Youth Services whether or not he believed that there had been an assault. We are inclined to the view that the facts of this case did not bring Laird within the purview of the statute but we need not decide that issue. Given the standard for *Stoneking* liability, our conclusion would be no different if there had been such a statutory duty.

plaintiffs. *Colburn v. Upper Darby*, 946 F.2d 1017, 1025 (3d Cir.1991).

While Laird's investigation may arguably have been deficient and while he arguably should have notified Children and Youth Services, the context in which these alleged shortcomings occurred cannot be ignored. Laird did respond promptly to the Hulings' complaint, Myers was confronted, and those who had been exposed to the known facts were convinced that no sexual abuse had occurred. We doubt that a rational trier of fact could conclude from this record that Laird's conduct in 1985 affirmatively contributed in some way to Myers' subsequent behavior. We are confident that no rational trier of fact could find from Laird's response to the Hulings' complaint that he was deliberately indifferent to whether children were molested on the bus. It follows that this response cannot be a predicate for *Stoneking* liability.[3]

Finally, it is harder to find fault with Laird's handling of the 1988 complaint. The parent who advised Laird of the problem also advised him that she was reporting it to Children and Youth Services. Laird's response to the complaint was prompt and efficient, resulting in the immediate and permanent suspension of Myers' services as a bus driver for the school district. Nothing in the record concerning the 1985 incident arguably provides a basis for *Stoneking* liability.

■ We also find that Laird stood in no "special relationship" with the students that would create an affirmative duty of care. This court's decision in *D.R. by L.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir.1992) is controlling. In *D.R.* this court affirmed the dismissal of a § 1983 action brought by two female students who had been sexually assaulted by male students while on school grounds. We began our analysis with "the well established principle that the Due Process Clause does not impose an affirmative duty upon the state to protect its citizens."

*Id.* at 1368–69. We recognized an exception to this general principle, however. A special relationship and a concomitant duty to protect against private actions of third parties arises when the State engages in an "affirmative act of restraining the individual's freedom to act on his own behalf." *Id.* at 1370 (quoting from *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005–06). As the Supreme Court explained in *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 200, 109 S.Ct. 998, 1005–06, 103 L.Ed.2d 249 (1989).

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

Examples of special relationship situations include incarcerated individuals, *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and individuals involuntarily detained in mental institutions. *Youngberg*.

In *D.R.*, we were required to decide whether a state's compulsory school attendance laws coupled with the *in loco parentis* authority of public school officials creates a "special relationship" between those officials and their students. We concluded that they did not because the students' "parents remain the primary caretakers" of their children and because the students were not deprived of access to any source of help they would have, absent the state restraints. We explained:

> Here it is the parents who decide whether that education will take place in the home, in public or private schools, or as here, in a vocational-technical school. *Id.* For some, the options may be limited to financial reasons. However, even when enrolled in public school parents

---

**3.** We are mindful of the affidavit of plaintiff's expert. The facts there set forth would at best support the proposition that Laird, according to the affidavit, "failed by a large margin to meet the standard of care of reasonably prudent educators." They will not support an inference of deliberate indifference on the part of Laird.

retain the discretion to remove the child from classes as they see fit, *see* Pa.Stat. Ann. tit. 24 § 15–1546 (1962 & Supp. 1991) (religious instruction); 22 Pa.Code § 11.26 (1992) (non-school sponsored educational trips and tours); Pa.Stat.Ann. tit. 24 § 13–1329 (1962) (healthcare), subject only to truancy penalties for continued periods of unexcused absence. Pa. Stat.Ann. tit. 24 §§ 13–1333 and 13–1343.... Moreover, as the Pennsylvania Supreme Court has recognized, even without reference to the Pennsylvania School Code or related statutes, "it [cannot] be denied that a parent is justified in withdrawing his child from a school where the health and welfare of the child is threatened." *Zebra v. School District of City of Pittsburgh*, 449 Pa. 432, 296 A.2d 748 (1972).

\*      \*      \*      \*      \*      \*

The analogy between school children and prisoners or the involuntarily committed is weakened further by the fact that school children remain resident in their homes. Thus, they may turn to persons unrelated to the state for help on a daily basis. D.R.'s complaint alleges an ongoing series of assaults and abuse over a period of months. Although these acts allegedly took place during the school day, D.R. could, and did, leave the school building every day. The state did nothing to restrict her liberty after school hours and thus did not deny her meaningful access to sources of help. 972 F.2d at 1371, 1372.

We find this case indistinguishable from D.R. If anything, the plaintiffs here were less affected by state restraints at the time of their alleged injuries than was D.R. Neither the state compulsory attendance law nor any other state rule required their presence on the Claypoole school bus. Their parents, their primary caretakers, were free to arrange any other form of alternate transportation or escort them to school personally. Moreover, the plaintiffs here, like D.R., had daily opportunities to seek help from their primary caretakers or others, as they ultimately did. We acknowledge, as plaintiffs stress, that school children may be reluctant to seek help in situations of this kind and may even be disbelieved if they do. The dissent in *D.R.* expresses a number of similar concerns. But these concerns are products of the age and circumstances of children; they do not emanate from any state imposed restraint. Under our analysis in *D.R.*, the relevant consideration is whether the plaintiffs have been deprived of any avenue of assistance they would have had absent any state involvement. Here, as in *D.R.*, there has been no such deprivation.

We thus conclude that there was no special relationship between Laird and the plaintiffs and, accordingly, that Laird had no affirmative duty to protect them from acts of private violence.

### V.

As with Laird, the record is devoid of any evidence that would support a judgment against the school district on either a *Stoneking* theory or a "special relationship" theory. It follows that all of the defendants are entitled to summary judgment and thus that the judgment of the district court will be affirmed.

SCIRICA, Circuit Judge, concurring.

I agree none of the defendants can be liable in this § 1983 action to redress the alleged sexual molestation of six girls aged six to eight years old on their school bus. Because I am troubled by the application of our case law in these factual circumstances, I write separately.

I agree the school bus driver, Clark Myers, the bus company president, Vernon R. Claypoole, and the bus company, Vernon R. Claypoole, Inc., cannot be liable because as independent contractors, they were not state actors. *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Of course were Myers an employee of the Indiana Area School District rather than an independent contractor, he could be subject to § 1983 liability. *See Lopez v. Houston Independent School Dist.*, 817 F.2d 351, 356 (5th Cir.1987); *Doe "A" v. Special School Dist. of St. Louis County*, 637 F.Supp. 1138, 1143 (E.D.Mo.1986). But

because the Indiana Area School District owns no buses, it must contract out bus service and therefore school bus drivers like Myers are not employees of the district.

The employee/independent contractor distinction seems an artificial and undesirable basis upon which to deny § 1983 liability here. Unlike in *Rendell–Baker*, where the state actors in question "showed relatively little interest in the school's personnel matters" which gave rise to plaintiffs' claims that they were discharged from employment without hearings, 457 U.S. at 843, 102 S.Ct. at 2772–73, here school superintendent David Laird treated Myers as if he were an employee, reprimanding him and ultimately suspending him permanently from driving the school district's buses following the alleged molestation. Additionally, this case involves sexual misconduct toward six, seven, and eight year-old girls, compelled by the state to attend school although not required to take the bus.

I also agree defendants Laird and the school district did not exhibit the "deliberate indifference" necessary for liability under *Stoneking v. Bradford Area School District*, 882 F.2d 720, 725 (3d Cir.1989), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990). I am less certain this case is also controlled by *D.R. by L.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir.1992). The majority reasons that here, as there, plaintiffs have not been deprived of any avenue of assistance they would have had absent any state involvement, in essence because they live at home and therefore do not face a "full time severe and continuous state restriction of [their] liberty." *D.R.*, 972 F.2d at 1371. The majority believes this case is easier than *D.R.* because there, a special relationship between the school and the students could at least arguably be derived from the fact that state law compelled school attendance, where as here, no such law compels students to take the school bus.

But this case in certain respects is more compelling than *D.R.* In *D.R.*, teenage students committed the violative acts on other teenage students, whereas here, a bus driver, working under the supervision of the school district, committed the acts on girls aged six, seven, and eight years old. Furthermore, at the time the acts occurred here, plaintiffs were under the total custody the driver of a school bus exerts over his passengers. *Compare D.R.*, 972 F.2d at 1372 ("the school defendants' authority over D.R. during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship" necessary for § 1983 liability).

It is difficult to understand why these factual circumstances are not constitutionally significant while others, such as the employee/independent contractor distinction and the theoretically volitional and temporary character of plaintiffs' use of the school bus, are constitutionally dispositive. I recognize we must draw lines to refine the state action requirement and the special relationship of care developed in *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). But applied here, these principles lead to a result that belies the gravity of the constitutional claims involved. Denying these § 1983 claims also ignores the practical realities of this case—the necessity for small school districts to contract out bus service, the reliance of families in rural areas upon school buses, and the defenselessness of young girls riding a school bus. When claims like these fall through the cracks, § 1983 seems less than the powerful tool to vindicate constitutional rights it was designed to be.